# ALFONSO SANCHEZ v. GEORGE M. WALDRUP.

136 N. W. (2d) 61.

June 25, 1965—No. 39,488.

*Earl L. Johnson,* for appellant.

*Berryman, Fisher & Johnson,* for respondent.

KNUTSON, CHIEF JUSTICE.

This is an appeal from an order denying defendant's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial on the issue of liability only.

The case arises out of a collision between a Chevrolet Corvair automobile driven by plaintiff and a Mercury automobile driven by Wesley McNutt, who was in no way responsible for the collision.

Grand Avenue in St. Paul runs east and west. Cretin Avenue runs north and south. Grand Avenue approaches Cretin from the east but does not continue through it, forming a T-intersection. At the intersection, Cretin is protected by a stop sign on Grand Avenue, Cretin being a through street. The posted speed limit on Cretin is 30 miles per hour.

On February 11, 1962, shortly before 10 o'clock in the morning, defendant was driving his car west on Grand Avenue. As he approached Cretin, he attempted to stop in obedience to the stop sign, but his car skidded into the intersection a few feet. At that time plaintiff was driving north on Cretin. He observed defendant's car skidding into the intersection when he was about 25 feet south of the intersection. He then turned to his left into the southbound lane of traffic and, after crossing the intersection, collided head on with McNutt, who was traveling south in his proper lane of traffic. Plaintiff testified that he never saw the McNutt car at all prior to the collision.

Plaintiff's testimony is that he entered Cretin south of St. Clair Avenue, which is parallel with and about six blocks south of Grand. He stopped both at the entry to Cretin and at St. Clair without any difficulty. His own testimony is the best description of what happened after he left St. Clair Avenue. The following is characteristic of his testimony:

"Q. And do you recall, as you left the intersection of St. Clair and Cretin, whether you did accelerate rapidly?

"A. Yes. I accelerated rapidly.

"Q. You normally do that as you start up from a stop at an intersection?

"A. Yes.

"Q. Now, as you drove the distance of approximately six blocks between St. Clair and Cretin Streets, after accelerating from the stop and reaching a driving speed, did you drive at a fairly constant speed that distance of roughly six blocks?

"A. Once I reached the normal traveling speed, yes, I didn't vary. I just went along at the normal speed.

"Q. And you had no occasion to stop or slow down or to accelerate then during that distance?

"A. No.

"Q. And what was the speed that you drove during that distance of five to six blocks?

"A. Again, it has to be an estimate. I know that the street is posted at 30 and the conditions were extremely slippery. Driving previous to this point I was able to establish this, and I would estimate I was traveling 20 to 25 miles down this stretch."

Defendant and his wife testified that they had come to a stop when the collision took place. They estimated that plaintiff was traveling 35 to 45 miles per hour when he passed in front of their car.

Wesley McNutt, who was called as a witness by plaintiff, testified that he had come to a complete stop before he was struck. He estimated plaintiff's speed at 35 to 40 miles per hour. He said that he did not think plaintiff slowed down at any time before the collision.

Mr. and Mrs. Leander J. Hallgren, who were called by defendant and were completely disinterested witnesses, testified that they were driving north on Cretin on their way to church. They stopped at St. Clair in obedience to a stop sign. While they were not quite through the intersection, a car which turned out to be that of plaintiff passed them on their left. They traveled the approximately six blocks from St. Clair to Grand at about 25 to 30 miles per hour. After passing

the Hallgren car, plaintiff gained about one and one-half blocks on them before the collision with McNutt. Hallgren, who is a chemist, estimated that compared to the speed at which he was driving plaintiff would have to drive 35 to 40 miles per hour to gain as much as he did in such a short distance. Mrs. Hallgren fully corroborated her husband. Her testimony is characterized by the following:

"* * * We were going 30 and it [plaintiff's car] was pulling away from us. I don't know too much about speed, but I would say he would have to have been going 40 to pull away from us that fast."

After plaintiff and defendant had both rested, plaintiff called as a rebuttal witness Professor Adolph O. Lee, an assistant professor of mechanical engineering at the University of Minnesota. Defendant objected to his testimony on the grounds that it was not proper rebuttal and that plaintiff had failed to disclose his name in answer to a pretrial interrogatory requesting the names of all "witnesses to this accident or the facts pertinent to the above lawsuit." In an affidavit in support of his post-trial motion for judgment notwithstanding the verdict or for a new trial, defendant contends that prior to the beginning of the trial the judge requested of both counsel the names of any or all of the witnesses who might be called to testify that were not previously disclosed so that both attorneys would have the benefit of this information when interrogating the jury, and the name of Adolph O. Lee was not disclosed at that time. Plaintiff's counsel, in an opposing affidavit, said:

"* * * [Y]our affiant's recollection is that Judge Edward D. Mulally requested of counsel only the names of medical witnesses to be called, * * *."

The trial court wrote no memorandum, so we have no way of knowing what his recollection of the matter was.

Professor Lee was called about 3 p. m. on Friday, March 6. When defendant objected to his testimony, the court recessed until 9:30 on Monday, March 9. Defendant's counsel was permitted to examine Professor Lee before then. Thereafter the court overruled defendant's objection and permitted the witness to testify. In answer to hypothetical

questions and based on certain scientific calculations, Professor Lee was able to reduce plaintiff's speed to 14.3 miles per hour and to have McNutt's Mercury moving in the opposite direction between 5 and 9 miles per hour.

The questions here are whether it was reversible error to permit Professor Lee to testify at all and, if not, whether a decision based on his calculations should be permitted to stand.

■ Defendant contends that it was error to permit Professor Lee to testify because plaintiff did not disclose his name in answer to a pretrial interrogatory. The interrogatory submitted by defendant, which appears in the record, reads:

"Do you know the names of any witnesses to this accident or the facts pertinent to the above lawsuit?"

The interrogatory then called for the names and addresses of such witnesses if they were known.

There is very little authority on the question of whether a party is obligated to disclose the name of an expert witness who may or may not be called. The interrogatory here does not specifically call for the name of expert witnesses. The Federal cases on the subject are not of too much help. In Texas & P. Ry. Co. v. Buckles (5 Cir.) 232 F. (2d) 257, certiorari denied, 351 U. S. 984, 76 S. Ct. 1052, 100 L. ed. 1498, the court, while seemingly indicating that if a party knew before trial that he was going to call a medical witness but failed to disclose his name the witness ought not to be permitted to testify, finally held that under the circumstances of that case it was not error to permit the witness to testify.

In 4 Moore, Federal Practice (2 ed.) § 26.24, p. 1536, we find the following:

"Since an expert witness can be examined before trial in proper cases, the adverse party should have the right to obtain discovery of his name under the provision for discovery as to 'the identity and location of persons having knowledge of relevant facts.'"

In support of the above statement we find Miller v. United States (D. Del.) 192 F. Supp. 218, 221, where the court said:

"The question then is whether there is a distinction between a factual witness and an expert witness with reference to the requirement of disclosure of the name by interrogatory. * * *

\* \* \* \* \*

"An expert witness may have, but usually does not have, any personal knowledge of the facts. His name has usually not been given as one having a knowledge of the relevant facts. His testimony is usually based upon a hypothetical question founded upon the testimony. The weight and value of the testimony of the expert witness depends largely upon the qualifications as such expert, and these qualifications may be the subject of intensive investigation by the opposing counsel. This investigation can only be had by a timely ascertainment of the name of the proposed expert witness. The selection of the expert witness is not entirely the work product of the lawyer, and the witness may be selected by and be compensated by the party answering the interrogatory.

"I am of the opinion that the disclosure of the name of an expert witness stands upon a different principle from that of a factual witness, and therefore Interrogatory No. 22 should be answered."

It should be noted that in the Miller case the interrogatory requested the name of each person who would testify for defendant as an expert whereas in the instant case the interrogatory was not that specific. See, also, Fidelis Fisheries, Ltd. v. Thorden (S. D. N. Y.) 12 F. R. D. 179; Hickey v. United States (E. D. Pa.) 18 F. R. D. 88.

Land condemnation cases usually are placed in a special category of their own. See, United States v. 6.82 Acres of Land (D. N. Mex.) 18 F. R. D. 195.

In this state we upheld the trial court's ruling excluding a factual witness whose name had not been disclosed in Gebhard v. Niedzwiecki, 265 Minn. 471, 122 N. W. (2d) 110. We there held that the duty to disclose was a continuing one and applied to witnesses discovered after the initial disclosure as well as those known beforehand. We said in that case (265 Minn. 476, 122 N. W. [2d] 114):

"One of the main purposes of Rules 26.02 and 33 is the discovery of facts which will enable litigants to prepare for trial free from the element of surprise which, prior to the adoption of the rules, frequently

led to a result based more upon the legal maneuvering of counsel than upon the merits of the case. That being the purpose of the rules, a construction of them that will defeat the purpose for which they were adopted should be avoided if that is possible."

In Lundin v. Stratmoen, 250 Minn. 555, 85 N. W. (2d) 828, where many of the authorities are collected, we held that the duty to disclose applied to witnesses known only to an attorney on the ground that the knowledge of the attorney is imputed to the client and the duty to disclose rested upon the client even though he knew nothing about the names of the witnesses. We held in that case that a new trial need not necessarily be granted for failure to disclose unless it was evident that a different result would be likely to follow on a new trial.

On the subject generally of the duty to disclose the names of witnesses, see Annotations, 27 A. L. R. (2d) 737 and 37 A. L. R. (2d) 1154.

■ Rule 26.02, Rules of Civil Procedure, contains the following with respect to the conclusions of an expert:

"* * * [E]xcept as provided in Rule 35,[1] the conclusions of an expert, shall not be required."

See, 48 Minn. L. Rev. 977, 988.

While this provision may preclude discovery of an expert's opinion except as provided by Rule 35, it does not reach the question presented here. If we are to permit an expert to reconstruct an automobile collision from scientific calculations, based solely upon assumptions as to facts, and permit his opinion to override the testimony of disinterested eyewitnesses to the accident, why should it not be as incumbent on the party intending to call him to disclose that fact as it is to disclose the names of factual witnesses? Ordinarily, parties rely on witnesses having knowledge of the facts. Of late years it has become more common to seek to establish facts from opinions of so-called experts who, knowing nothing about the facts, reconstruct the occurrence from assumed facts which may or may not present the whole picture.

---

[1]Rule 35 deals with physical and mental examinations of persons and has nothing to do with the facts of this case.

If such an expert is to be called, he should not be given a preferred status over other witnesses. Other parties ought to be given an opportunity to investigate his qualifications and, if necessary, obtain the assistance of equally qualified experts on the other side of the case.

Normally, experts are permitted to express opinions because they are dealing with a field of knowledge unfamiliar to others and particularly to the finders of fact. The purpose of such opinion is to aid the factfinders in coming to the right conclusion in a field in which they are untrained. For the same reason, lay witnesses are not permitted to express opinions in such fields of knowledge because they are not qualified to form an opinion. That is not true here. The type of expert opinion we are dealing with here lies in a field where an ordinary lay person can form an opinion. We have long held that any person with reasonable intelligence, a fair opportunity to observe, and ordinary experience with moving vehicles may express an opinion as to the speed of an automobile. Dunkelbeck v. Meyer, 140 Minn. 283, 167 N. W. 1034; Daly v. Curry, 128 Minn. 449, 151 N. W. 274; Aasen v. Aasen, 228 Minn. 1, 36 N. W. (2d) 27. In this area, the opinion of the expert is not intended so much to aid the jury in coming to the right conclusion because the members of the jury are unable to form a rational opinion about the subject matter under consideration as to replace or be a substitute for the testimony of eyewitnesses and others who have actual knowledge of the subject matter. Opinions of eyewitnesses as to speed, based on observation and experience, are often more reliable than a calculation of speed based on unknown variables that can change the result materially if they are not precisely correct. Disinterested eyewitnesses who have the necessary opportunity to observe, intelligence to form a rational opinion, and ordinary experience with moving vehicles ought not to be placed in a less favorable position than an expert who reconstructs the accident from assumed facts. Nor should such expert be given a preferred status as a secret surprise witness. If there is a possibility that he will be called, his name should be disclosed the same as any other witness claiming to have knowledge of the facts who may or may not be called as a witness.

■ Failure to disclose the name of a known witness, however, does not automatically result in a new trial. Much must be left to the sound discretion of the trial court. If the harm can be cured by a continuance or imposition of other sanctions, the trial court must be left some latitude in determining how the case should be handled. Whether the continuance in this case protected the defendant sufficiently we need not now determine, but if the court had excluded the expert, we would be inclined to agree.

■ Plaintiff contends that the evidence was rebuttal and that he did not know whether Professor Lee would be called until defendant had interposed his evidence relating to contributory negligence. That may be, but it should not have been difficult to anticipate that Professor Lee would be called if there was any evidence relating to that phase of the case. The same is true of any witness having some knowledge of the facts. Trial strategy may result in a witness being called or not called, depending on how the case develops, but that does not excuse failure to disclose his name if he is a factual witness who might be called, even if he is discovered after the trial commences. Gebhard v. Niedzwiecki, 265 Minn. 471, 122 N. W. (2d) 110. The same ought to be true of an expert on factual issues, whose testimony is intended to counteract or replace the testimony of factual witnesses if it becomes tactically advantageous to call him.

Furthermore, it is obvious that the opinions of Professor Lee went far beyond rebuttal. They were not only in conflict with the testimony of defendant's witnesses, but they were contrary to plaintiff's own testimony and his witnesses as well. To that extent they were impeachment of plaintiff's own witnesses rather than rebuttal. One of plaintiff's witnesses and all of defendant's witnesses were in substantial agreement as to the excessive speed of plaintiff, which Professor Lee completely ignored.

■ The most important question, however, is whether the foundation laid for Professor Lee's opinion is reliable enough that a decision based on it can stand the test of reason. We think not. The case is not unlike Grapentin v. Harvey, 262 Minn. 222, 114 N. W. (2d) 578. In that case the speed of an automobile was calculated from the length

of skid marks without taking into consideration the type of concrete pavement involved. Here the nature of the ice covering the pavement is involved. Calculation in both cases is based on the coefficient of friction—a scientific term ordinarily beyond the comprehension of jurors.

The testimony in this case is that the surface of the street involved was "icy," "slippery," "very slippery," "very icy," et cetera. Whether there was continuous ice, packed snow, or intermittent ice does not appear. Professor Lee based his calculations on the coefficient of friction of .08, assuming an icy roadway. In Traffic Accident Investigator's Manual for Police, published by the Traffic Institute of Northwestern University, on p. 420, we find a table of possible ranges of pavement drag factors for rubber tires. On smooth, dry ice the coefficient of friction varies from .10 to .25 at less than 30 miles per hour and from .07 to .20 at more than 30 miles per hour. On wet ice it ranges from .05 to .10 at any speed. The testimony in this case is that it had been raining and sleeting during the night and early morning but that it had stopped prior to the time of the accident. It was four degrees above zero, so it is safe to assume that the ice on the street at the time of the accident was relatively dry.

However, on packed snow the coefficient of friction ranges from .30 to .55 on dry snow at less than 30 miles per hour and from .35 to .55 at more than that speed and from .30 to .60 on wet snow at any speed. With respect to the use of this table, we find the following on p. 423:

"The table gives a *range* of values for most of the common descriptions of pavement. You cannot tell where, within this range, a particular pavement will be. If you want a calculated speed which is a minimum, that is, at or above which the vehicle was going beyond a reasonable doubt, use the lower figure in this range. If you want a probable speed, use a figure midway between the extremes of the range."

In Judge and Prosecutor in Traffic Court, published by the American Bar Association and the Traffic Institute, we find the following on p. 190:

"Estimating the coefficient of friction of a certain pavement is similar to guessing how much a man weighs when he is six feet four inches tall and 40 years old."

The unreliability of this type of testimony is demonstrated by a comparison of the Grapentin case with this one. In that case, where it was important to establish a high rate of speed, a high coefficient of friction was adopted. In this case, where it was important to establish a low rate of speed, a low coefficient of friction was adopted, and in both cases the desired result was reached by the expert. Obviously, adoption of an erroneous coefficient of friction will lead to a wrong result.

The unreliability of this type of testimony is also demonstrated by its comparison with testimony of eyewitnesses. Plaintiff himself said that he was traveling 20 to 25 miles per hour. Plaintiff's own witness, McNutt, said that plaintiff was traveling 35 to 40 miles per hour. Two wholly disinterested witnesses estimated his speed from 40 to 45 miles per hour and testified that he passed them and, while they were traveling 25 to 30 miles per hour, gained 1½ blocks on them while they were traveling less than 6 blocks. McNutt testified that he had come to a complete stop. Professor Lee was able to have him traveling between 5 and 9 miles per hour and plaintiff at the rate of 14.3 miles per hour, both of which conclusions were completely contrary to all the evidence of all the witnesses in the case, including plaintiff himself. It must be apparent that either the coefficient of friction used by Professor Lee was wrong, because the roadway was not as icy as he assumed it to be, or that none of the witnesses, including plaintiff himself, knew what they were talking about. In Grapentin v. Harvey, 262 Minn. 222, 230, 114 N. W. (2d) 578, 583, we said:

"* * * [I]t is our impression that under the record here, where plaintiffs were obviously relying on the testimony of Lee to supply the clinching evidence as to the speed of defendants' car, the confusion in the evidence made the assumptions included in the hypothetical question unwarranted and resulted in prejudice to the defendants. These are not matters which go merely to the weight of the expert's testimony; if the hypothetical question is faulty, the answer thereto has no weight whatsoever and should be excluded."

That is likewise true here. Without more definite knowledge as to the true condition of the highway and use of a coefficient of friction that would be justified under the facts, the expert's opinion was of no value. In view of the importance normally accorded scientific training and knowledge, the jury could well have been misled into disbelieving all the witnesses who were present at the scene.

The case is reversed and new trial granted on the issue of liability. Reversed.