Raymond W. DALEIDEN, Appellee,

v.

The CARBORUNDUM COMPANY,
Appellant.

No. 19953.

United States Court of Appeals,
Eighth Circuit.

March 10, 1971.

Mahoney, Dougherty, Angell & Mahoney, Richard P. Mahoney, John F. Angell, Minneapolis, Minn., for appellant.

Edward H. Borkon, Schermer, Gensler, Schwappach, Borkon & Ramstead, by Irvin E. Schermer, Minneapolis, Minn., for appellee.

Before JOHNSEN, Senior Circuit Judge, and VAN OOSTERHOUT and HEANEY, Circuit Judges.

HEANEY, Circuit Judge.

The plaintiff, Raymond W. Daleiden, brought this diversity action against the defendant, the Carborundum Company, a Delaware corporation, to recover damages for injuries inflicted by a grinding wheel manufactured by the defendant. The case was tried to a jury in the United States District Court for the District of Minnesota on the theories of negligence and strict liability. Following a general verdict awarding $65,000 in damages to the plaintiff, the defendant moved for judgment notwithstanding the verdict or, in the alternative, for a new trial. The defendant appeals from the District Court's denial of its motion. We affirm the District Court.

In considering whether the trial court erred in denying the defendant's motion for judgment n. o. v., we examine the evidence in the light most favorable to the plaintiff. Land O'Lakes Creameries, Inc. v. Hungerholt, 319 F.2d 352 (8th Cir. 1963); Ford Motor Co. v. Zahn, 265 F.2d 729 (8th Cir. 1959); McCormack v. Hankscraft Company, 278 Minn. 322, 154 N.W.2d 488 (1967). We have examined the transcript of the trial and find that the plaintiff's brief fairly sets out the facts as proven.

On November 14, 1963, the plaintiff, while operating a motor-driven machine equipped with a cutting wheel manufactured by the defendant, sustained severe arm injuries as a result of the wheel's shattering. The plaintiff was an employee of the Spancrete Division of the North Star Concrete Company, a manufacturer and installer of concrete slabs. The wheel which shattered was from a shipment of twenty-eight wheels manufactured by the defendant and delivered to the Spancrete Company in August of 1963.

The wheels consisted of layers of nylon impregnated with a bonding material containing abrasive particles. The American Safety Code required the manufacturer to designate on each wheel its maximum rotational speed.

The wheels were used to cut concrete slabs at the job site. They were mounted on 18-horsepower, gasoline-driven Cardinal machines with two spindles near the front, one of which extended horizontally to the right and the other to the left. The cutting wheel contained a center arbor hole which permitted the wheel to be slipped over one of the spindles and against a solid flange forming part of the machine. A paper blotter or disc, likewise containing a center arbor hole, was customarily placed on either side of the wheel. The wheel was held in place by a second flange positioned on the opposite side of the wheel and tightened by screws. The operator stood at the rear of the machine and propelled it backwards or forwards by pushing or pulling on handles. The cutting wheel was lowered or raised to and from the cutting area by means of a hand crank.

The Spancrete Company began using a 22-inch wheel manufactured by the defendant in 1963. The wheel had the name Carborundum stenciled at the top and bore the notation "MAX RPM 24 30". The plaintiff understood this to mean that the wheel could not be used safely beyond the speed of 2400 to 3000 revolutions per minute. The Cardinal machine was stamped to indicate an output speed of 2600 revolutions per minute

at top speed. It was fitted with a guard large enough to extend over the 22-inch wheel.

During August of 1963, the Spancrete Company decided to increase the maximum thickness of its slabs from eight to ten inches. The 22-inch Carborundum wheel was not large enough to cut this size slab. Clifford Strong, the defendant's managing sales representative, came to the Spancrete plant to discuss with Lester Fisher, its plant manager, the size wheel necessary to cut the 10-inch planks. Both Strong and Fisher determined that a 26-inch wheel should be used, although they were aware that this size wheel would not comply with the American Safety Code standards. The maximum speed at which a 26-inch wheel should be operated under the code was 2056 r. p. m. Strong did not advise Fisher to drop the speed of the Cardinal machine to the maximum safe speed for 26-inch wheels.

An initial order for twenty-five wheels was taken by Strong from Fisher on August 14, 1963. These were manufactured as a trial order at defendant's Logan, Ohio, plant from specifications prepared by its development personnel. There was an overrun of three wheels, so that twenty-eight were actually manufactured and shipped.

Only five out of the twenty-eight wheels were tested prior to shipment. The only balancing test performed was a static test which did not involve inspection of the wheels while they were in motion. There was expert testimony that a dynamic test could and should have been done since it would approximate the actual use of the wheel and was designed to disclose imperfections not discernible by static balance testing. Undisclosed imperfections could cause a whip to occur during the cutting operation, resulting in wobble, sideloading and breakage.

The twenty-eight wheels reached the Spancrete Company during the latter part of August, 1963. They were first used on November 14, 1963 at the Pine Ridge School project in Newport, Minne-

sota. When the 26-inch wheels were brought to the job, it came to Fisher's attention that the existing guards on the Cardinal machines did not fit over the 26-inch blades. He ordered them removed and instructed the workmen to proceed without them.

The plaintiff was one of the workmen on the Pine Ridge project. He had been employed full time by the Spancrete Company for about three months prior to the accident. He was twenty-seven years of age and prior to working for the Spancrete Company had worked on a farm. Prior to the accident of November 14, 1963, the plaintiff had used only 22-inch wheels. He had never had a blade explode while he was operating the cutting machines and was not aware this could occur. He knew the guard on the Cardinal machine was for safety purposes, but assumed it was to prevent someone from falling onto the machine or to keep sparks from flying. He had never been told that the guard was to prevent injury to an operator in the event of an explosion of a wheel.

On the day of the accident, Daleiden's foreman told him to cut a 24- by 24-inch hole in the 10-inch planks forming the roof of the building. When Daleiden got the Cardinal machine, there was a 22-inch wheel mounted on it. He noted that there was no guard on the machine and brought this to the attention of his foreman. He was instructed to cut the hole without it.

Pre-cuts were made on the four sides with the 22-inch wheel. This involved partially cutting through the cement slabs with the 22-inch wheel. To get through the last few inches, he had to use a 26-inch wheel. The foreman told him that these were located in a box in a company truck. There were two 26-inch Carborundum wheels located in the box, and he took out one and inspected it. Other than the name Carborundum, there was no writing on the wheel. There were no blotters in the box. In general appearance and texture, the 26-inch wheel was similar to the 22-inch wheels with which he was familiar. He

had never used a 26-inch wheel before. He mounted the wheel on the left-hand spindle and completed the two cuts which were parallel with the length of the planks. He then lined his machine with the markings for the first cross cut, lowered the cutting wheel and was just about finished cutting the concrete when the wheel shattered without warning. He was running the wheel at top speed at the time and was in the process of cranking the wheel down. The fragments came from the bottom of the machine and struck the underside of his forearm.

Prior to the accident, he had not bound, bent or crimped the wheel in the process of making the cut, and the up-and-down cranking movements of the machine had not caused the wheel to move in the cut. He had not at any time prior to the accident sawed away from the cut or moved off the direct line of the cut.

Within a week after the accident, employee Eugene Anderson took the balance of the Carborundum shipment to North Dakota for work on a project there. He used the wheels on the same Cardinal machine and testified they did not perform properly when used. They were not rigid enough for the work, developed a bad wobble when the cut was started, and vibrated so badly that a ³⁄₁₆-inch cut would expand into a ³⁄₈-inch cut. They would fly apart both at high and low speeds, and upon contact of the wheel with the cement being worked, he noted that the fabric would peel and come unbounded and the wheels would disintegrate. He estimated that he broke about fifteen of these wheels. A guard had been placed on the machine, but this did not keep fragments from flying into the air, which on many occasions came quite close to him.

In view of the fact that the case was submitted to the jury on both negligence and strict liability theories, and that a general verdict was returned, we can sustain that verdict only by satisfying ourselves that the jury could have relied on either theory.

This being a diversity case, Minnesota law controls. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

The defendant has three bases for its contention that the trial court should have entered judgment n. o. v. While the defendant has stated these contentions as questions of law, the essence of them is that the plaintiff's evidence, with respect to two elements of his cause of action, was insufficient to send the case to the jury.

I

The defendant asserts that, as a matter of law, there was no evidence of negligence in the design and manufacture of the grinding wheel, and no evidence of a defect at the time the wheel left the manufacturer's control.

■■■ Under Minnesota law, the plaintiff can recover under the theory of strict liability if he establishes (1) that he was injured, (2) that his injury was caused by the defendant's product, (3) that the injury occurred because the defendant's product was defective, and (4) that the defect was present in the product when it was sold by the defendant. Kerr v. Corning Glass Works, 284 Minn. 115, 169 N.W.2d 587 (1969); McCormack v. Hankscraft Company, *supra*. A product is defective if it fails to perform reasonably, adequately and safely the normal, anticipated or specified use to which the manufacturer intends that it be put, and it is unreasonably dangerous to the plaintiff. Farr v. Armstrong Rubber Company, 179 N.W.2d 64 (Minn.1970). Circumstantial evidence may be used to establish that the product was defective when it left the manufacturer's hands. Holkestad v. Coca-Cola Bottling Co. of Minnesota, Inc., 180 N.W.2d 860 (Minn.1970).

■■■ The plaintiff's evidence was sufficient to permit the issue of a defect to go to the jury. The plaintiff testified that he had not bound, bent or crimped the wheel in making the cut. His expert witness, Brenna, concluded that the

cause of the shattering was an improper manufacturing process resulting in improper bonding. A co-employee of the plaintiff testified that many of the remaining wheels shattered in normal use, and that pieces of the wheels sometimes came dangerously close to him.

■ In order to prove a defect, a plaintiff is not required to eliminate with certainty all possible causes of an accident. It is sufficient if the evidence reasonably eliminates improper handling or misuse of the product by others than the manufacturer, thus permitting the jury to reasonably infer that it was more probable than not that the product was defective. Holkestad v. Coca-Cola Bottling Co. of Minnesota, Inc., *supra.*

■ The plaintiff also produced evidence to sustain a finding that the defendant was negligent. A manufacturer may be liable if it fails to exercise reasonable care in the design and manufacture of a product. It may also be liable if it knows or should know that its product is apt to cause bodily harm if not used in a specific manner, but the manufacturer fails to furnish adequate warning of the dangers foreseeable in the use of its product. Lovejoy v. Minneapolis-Moline Power Implement Co., 248 Minn. 319, 79 N.W.2d 688 (1956).

The failure of Carborundum to perform adequate tests raised a jury question as to the defendant's negligent manufacturing processes. The plaintiff's evidence that the wheel contained no warning of possible explosion, and no notation of maximum speed, was undisputed.

The trial court, therefore, did not err in denying the defendant's motion on the ground that the plaintiff did not establish a defect or negligence.

## II

The defendant next contends that, as a matter of law, the plaintiff failed to show that the defendant's claimed negligence or any claimed defect in the defendant's wheel was the factual cause of the plaintiff's injury.

We find that the plaintiff's evidence was sufficient to present the issue of negligence to the jury. That evidence, if credited, would lead to the conclusion that the defendant's negligent production of the defective wheel was the cause of the accident. Evidence was also adduced which showed that the manufacturer's failure to properly test its product and to include sufficient warning of the danger inherent in the product was the cause of the accident.

■ Under strict liability theory, the plaintiff must prove that the claimed defect was the factual cause of the injury. As we understand Holkestad v. Coca-Cola Bottling Co. of Minnesota, Inc., *supra,* the plaintiff has proven his case if he shows that the product was defective in a manner which could have caused the accident, and if he negates his own and others' misuse of the product. We find that Brenna's testimony raised the issue of a defect in the product and that the testimony of the plaintiff and his co-employee negated misuse of the wheel as the factual cause of the injury.

Thus, on this ground, the trial court correctly denied the defendant's motion for judgment n. o. v.

The defendant does not argue that the plaintiff's injury was not caused by its wheel or that the defect, if proven, did not exist when the wheel left the defendant's hands.

## III

The defendant argues that the evidence showed that the sole proximate cause of the plaintiff's injury was his failure to use a protective guard at the time of the accident, while he was fully aware of the hazard presented.

Our review of the evidence belies this assertion. The evidence showed that the plaintiff was aware of the danger of sparks flying from the wheel or of someone falling onto the wheel. There was no showing, however, that the plaintiff was aware the wheel could explode and injure him. He had never seen a wheel

explode, had never heard of one exploding, and had never been warned that one could explode. This case is thus unlike Magnuson v. Rupp Manufacturing, Inc., 285 Minn. 32, 171 N.W.2d 201 (1969), relied upon by the defendant. In *Magnuson,* the plaintiff, a mechanic, attempted to recover for injuries suffered in a snowmobile accident as a result of the dangerous location of a spark plug. The plaintiff, on several occasions before the accident, had removed, cleaned and repaired the spark plug. Under these circumstances, the Minnesota Supreme Court held that the proximate cause of the accident was the plaintiff's operation of a snowmobile with an obvious defect. The court cited with approval cases which state that the plaintiff must be unaware of the danger to recover. Magnuson v. Rupp Manufacturing, Inc., *supra,* 171 N.W.2d at 207.

The case before us is similar to McCormack v. Hankscraft Company, *supra,* in which some danger was apparent, but the nature and extent of the specific danger which caused the injury was not obvious. The court there held the manufacturer liable.

With respect to whether or not the plaintiff's use of a guard would have prevented his injury, the evidence was in conflict. The plaintiff's expert testified that a guard would not have prevented the accident; the defendant's expert testified that it would have. The plaintiff's co-employee testified that a guard did not prevent pieces of wheel from flying out of the cut when he used the remainder of the Carborundum shipment.

The issue of proximate cause is for the jury. Hungerholt v. Land O'Lakes Creameries, Inc., 209 F.Supp. 177 (D.C. Minn.1962). There was enough evidence to send the issue to the jury here.

The remaining issues form the basis of the defendant's contention that its alternative motion for a new trial should have been granted.

**IV**

The defendant contends that the testimony of the plaintiff's expert, Brenna, should have been struck because the matters he testified to were not related to the accident, and because his testimony permitted the jury to speculate.

We find, after examining the record, that Brenna's testimony relative to the testing was directly connected up with the cause of the accident. Further, his testimony with respect to safety factors was relevant in establishing a standard by which the conduct of the defendant was to be judged.

The defendant further argues that Brenna's testimony allowed the jury to speculate as to the cause of the accident. The Minnesota Supreme Court has limited the use of expert testimony as follows:

"A hypothetical question must embody substantially all the undisputed facts relating to the subject upon which the opinion of the witness is asked, and should contain all material facts relevant thereto. * * * The trial judge should be given discretion to determine * * * how far the jury may be trusted, with the aid of argument, to discover the conditional nature of the opinion.

"* * * [A] hypothetical question cannot contain extra facts which are not in evidence."

Grapentin v. Harvey, 262 Minn. 222, 114 N.W.2d 578 (1962).

Based upon this standard, we find that Brenna's opinion was admissible. All facts contained in the hypotheticals put to the witness had been testified to by others. This case is distinguishable, therefore, from Sanchez v. Waldrup, 271 Minn. 419, 136 N.W.2d 61 (1965); Erickson v. Northern Minnesota Nat. Bank, 235 Minn. 232, 50 N.W.2d 489 (1951); and Hanrahan v. Safway Steel Scaffold Co. of Minnesota, 233 Minn. 171, 46 N.W.2d 243 (1951), where ex-

pert opinion was held inadmissible because based upon facts not in evidence.

## V

The defendant urges that Brenna's testimony regarding the cause of the accident was based upon an assumption of fact contrary to the evidence.

The evidence showed that the grinding wheel had broken into at least three pieces. Only three pieces were recovered, and together they constituted less than one-fourth of the total area of the wheel. The defendant asserts that Brenna's opinion was based upon an assumption that the wheel broke into *only* three pieces.

There is no support for this assertion. Brenna's testimony on this point is not a model of lucidity, but it is clear that his opinion was correctly based upon the fact that the wheel fractured into more than three pieces.

## VI

The defendant's contention that there was no foundation for the testimony of Anderson, the plaintiff's co-employee, respecting the performance of the remaining wheels, is unavailing. Anderson's description of the wheels he used showed that they were identical in appearance to the wheel which injured the plaintiff, and dissimilar to other manufacturers' wheels which Spancrete subsequently used.

The plaintiff testified that the wheel he used was stamped "Carborundum." Anderson testified that the wheels he took were the only ones in the storage room at that time. Fisher testified that the only wheels in the storage room at the time of the accident were Carborundum wheels with "Carborundum" stamped on them. He further stated that they did not switch to other wheels until after they had used up the Carborundum wheels.

On these facts, we find that there was sufficient foundation for Anderson's testimony.

## VII

The defendant finds error in the failure of the trial court to instruct the jury that the manufacturer had no duty to warn the plaintiff of an obvious danger.

On the facts stated in Section III of this opinion, we conclude that the plaintiff showed that the danger was not obvious to him. The defendant offered no evidence that the danger of the wheel's exploding was or should have been obvious.

The trial court was correct in not instructing on the manufacturer's lack of duty to warn of an obvious danger.

## VIII

The defendant's final allegation is that the jury was contaminated. The jury was chosen from a pool which included jurors from a previous products liability case, involving a plaintiff named Brynteson, before the Honorable Miles W. Lord. At the conclusion of that trial, Judge Lord instructed the jurors that they should not sit as jurors on another products liability case. While none of the jurors from the earlier case sat as jurors on the case before us, four members of the jury in this case had heard about Judge Lord's instructions.

The defendant herein, because of Judge Lord's instructions, moved for a mistrial at the close of the plaintiff's opening statement. The motion was denied. At the conclusion of the trial, the defendant moved for a new trial, citing as one of its reasons the alleged contamination of the jury.

In response to this motion, the presiding judge, the Honorable Earl R. Larson, conducted a special hearing. All of the jurors, except one who could not be reached, were questioned by the court and by the defendant's counsel. Six of

the jurors had heard nothing about the *Brynteson* case or Judge Lord's instructions, while the remainder had.

Juror Eckdahl had heard of the *Brynteson* case and knew that Judge Lord had instructed the jurors in that case not to sit on another products liability case. She did not know the verdict in *Brynteson* and did not know the reason for Judge Lord's instructions.

Juror Terry knew that the verdict in the *Brynteson* case had been for the defendant, but had no knowledge of Judge Lord's instructions.

Juror Smothers had been told of Judge Lord's instructions. One of the *Brynteson* case jurors had told her that Judge Lord had been unhappy with the verdict and had discussed it with the jury after they returned. Juror Smothers had also been told that the defendant had prevailed because the jury thought the parents of a five-year-old child should not have allowed him to operate a power lawn mower.

Juror Carlson knew that some jurors had been instructed not to sit on another products liability case, perhaps because of the way the trial went, but he was not sure this was the reason. He did not know what case the jurors had sat on.

Juror Bylund knew some jurors had been instructed not to sit on another products liability case. He knew nothing about the *Brynteson* case.

We are satisfied that Judge Larson, after reviewing these facts, was correct in denying the defendant's motion for a new trial. Each of these jurors stated that anything they may have learned with respect to Judge Lord's instructions or the *Brynteson* case did not prevent them from being fair and impartial in their consideration of this case. The defendant has failed to show that it was prejudiced by Judge Lord's instructions. See, Myers v. George, 271 F.2d 168 (8th Cir. 1959).

The judgment of the District Court is affirmed.