**Donald G. DUNSHEE, Respondent,**

v.

**Sheldon F. DOUGLAS, Individually, and d.b.a. S. F. Douglas Truck Line, et al., Appellants.**

**Nos. 46772, 46795.**

Supreme Court of Minnesota.

May 27, 1977.

---

Van Eps & Gilmore and Duane E. Arndt, Minneapolis, for appellants.

James R. Schwebel and Gregory P. Joseph, Meagher Geer Markham Anderson Adamson Flaskamp & Brennan and R. D. Blanchard, Minneapolis, for respondent.

Heard before TODD, YETKA and STAHLER, JJ., and considered and decided by the court en banc.

THOMAS J. STAHLER, Justice.*

In this action to recover for personal injuries and property damage arising out of a motor vehicle collision, the Hennepin County District Court entered judgment pursuant to a jury verdict finding defendant Mark Joseph Lesch 100-percent causally negligent and assessing plaintiff's damages at $233,000. Defendants appeal from an order denying their motion for judgment notwithstanding the verdict or, in the alternative, for a new trial and from the judgment. We affirm.

On April 9, 1973, plaintiff, Donald G. Dunshee, and defendant Mark Joseph Lesch were involved in a multivehicle collision on Interstate Highway No. 494 near Cedar Avenue in Bloomington. Defendant Lesch was driving a truck in the course and scope of his employment with defendant Sheldon F. Douglas, d.b.a. S. F. Douglas Truck Line. Plaintiff gave the following version of the accident. Plaintiff was traveling westbound in the far left of three lanes of traffic. He stopped his car approximately 50 feet behind a line of vehicles which, apparently due to an accident, had already stopped. While stopped, he looked to the rear and noticed defendant's truck approximately 100 feet behind him sliding toward his vehicle at a 45-degree angle in a jackknifed position. There was nothing between himself and the sliding truck. On making this observation, in order to protect himself he attempted to place his suitcase between himself and the steering wheel while sliding down in his seat. The plaintiff did not visually observe the actual impact.

At the time of the accident it was snowing and visibility was poor. Donald Yaste, another driver involved in a collision with defendant's vehicle, testified that he had brought his car to a stop in the right hand land of the highway and placed the transmission in "Park." While his car was stopped he noticed plaintiff's Mustang sliding past him at about 30 miles per hour *already damaged.* He then saw defendant's truck in a jackknifed position coming at

* Acting as Justice of the Supreme Court by appointment pursuant to Minn.Const. art. 6, § 2, and Minn.St. 2.724, subd. 2.

him from the rear at about 50 miles per hour. He observed no vehicles between the truck and the Mustang. The truck collided with his vehicle, propelling it forward 15 feet or more while the transmission remained in "Park."

Defendant driver Mark Joseph Lesch testified that the tractor-trailer unit he was driving was 48 feet in length; that the tractor weighed 7½ tons and the empty trailer weighed over 5 tons; that prior to the accident he had been traveling 50 miles per hour; that his truck jackknifed after he hit his brakes; and that he hit at least two vehicles but that he doubted that he struck plaintiff's Mustang. There were no witnesses who saw the truck actually strike the car, although there was considerable evidence, including photographs, regarding the positions of the vehicles after the accident. The fact of the collision was established largely by inference from testimony of plaintiff, Yaste, defendant Lesch, the investigating highway patrol officer, photographic evidence, and the absence of anything else which might have caused the damage to plaintiff's vehicle.

Plaintiff was either unconscious or incoherent immediately after the accident. He was taken to Fairview Southdale Hospital where he remained for 18 days. His evidence tended to establish the following injuries: The left carotid artery, a major source of blood to the brain, had become obstructed. Coordination of the left arm and leg is reduced. The left side of the body experiences numbness and tingling. Plaintiff's personality has altered and he is more irritable. He has headaches and takes tranquilizers. His memory, ability to concentrate, and certain other mental functions have become impaired. He also suffered some broken ribs and other minor injuries.

Plaintiff commenced this action in June 1973. On January 15, 1976, 2 weeks before trial was scheduled to begin, he underwent an adverse medical examination. At approximately the same time he was examined by his own expert, Dr. W. Allen Hauser. Dr. Hauser had not previously been disclosed as a witness because it was expected that Dr. R. F. Galbraith, one of plaintiff's treating physicians, would testify. When plaintiff learned that Dr. Galbraith might be unable to testify, he arranged the Hauser examination. After receiving a copy of Dr. Hauser's report, defendants moved for a continuance. The motion was denied and trial began on January 28.

■ 1. Defendants' first assignment of error relates to the court's refusal to grant the continuance. The granting of a continuance is a matter within the discretion of the trial court and its ruling will not be reversed absent a showing of clear abuse of discretion. *Kate v. Kate*, 234 Minn. 402, 48 N.W.2d 551 (1951).

■ Defendants claim they should have received a continuance because they received copies of the medical reports of Dr. Galbraith a short time prior to trial, and because Dr. Hauser's conclusion of bilateral brain damage was unexpected. It is important to note first that defendants were provided copies of Dr. Galbraith's and Dr. Hauser's reports before trial (and before plaintiff received the report of Dr. David Johnson, the adverse examiner). There is some dispute as to just what reports defendants received and what requests for documents were made. Without reviewing the history of the litigation in detail, we note that defendants had over 2½ years to undertake discovery but apparently did not do so in earnest until a few months before trial. In addition, plaintiff provided defendants with medical authorizations. The trial court would therefore have been justified in placing on defendants the primary responsibility for failure to discover the reports. Finally, defendants have not shown any prejudice resulting from late receipt of the reports.

Defendants' major ground for a continuance was that they were surprised by Dr. Hauser's conclusion of bilateral brain damage and, in particular, an organic memory impairment. Dr. Hauser's examination was arranged to counter the effect of the adverse examination by Dr. Johnson and be-

cause it was feared that Dr. Galbraith would be unable to testify. For the most part Dr. Hauser's conclusions mirrored those of Dr. Galbraith. Defendants point to only one aspect, the cause of the memory deficit, as grounds for a continuance. They claim they relied on an earlier report by Dr. Paul Olson, a consulting psychologist, suggesting that the impairment had a psychological basis. Defendants were free to introduce evidence regarding this report at trial and, in fact, did so, but inasmuch as plaintiff did not concede the truth of its conclusions he was free to controvert it. Defendants knew of the claimed memory impairment and the fact that a severe head injury could possibly result in permanent damage. They therefore should have anticipated Dr. Hauser's conclusion of organic memory impairment. Taken as a whole, Dr. Hauser's testimony presented nothing radically new or unexpected. Since it would have substantially inconvenienced plaintiff to delay the trial, the judge did not abuse his discretion in refusing the continuance.

■ 2. Defendants also assign as error certain testimony of Dr. Hauser concerning the condition of plaintiff's left carotid artery. Dr. Hauser testified that as a result of occlusion of the artery, there was some scar formation which increased the risk of stroke or aneurysm.[1] Defendants argue first that this opinion lacked foundation in

1. The testimony in controversy was as follows:

"Q. Doctor, again asking you to take all the same factors into consideration, do you have an opinion with reasonable medical certainty as to whether the injury to the left carotid artery on Donald Dunshee is an injury that is permanent in nature?

"MR. ARNDT: Objection. No foundation. Calls for speculation.

"THE COURT: Overruled. You may answer.

"THE WITNESS: I would anticipate that the alterations to the artery wall have to some extent, if not to a major extent, cleared at the present time. However, on the assumption that this injury is related to trauma and I would assume bleeding into the actual substance of that artery, I would expect there would be some degree of scar tissue inside of that artery. Arteries normally have a coating of muscle that surrounds them, and I would expect there would be some disruption of that coating of muscle. I would also expect there may not be complete healing of or at least recurrence to the normal smooth walls which one expects to see.

"So it would be my feeling that this injury would in all likelihood predispose to an increased risk for that artery rupturing at some point and also an increased risk to that particular vessel forming areas for arteriosclerotic or collections of material.

"Q. Doctor, what is the risk of an accumulation of arteriosclerotic material in the carotid artery?

"MR. ARNDT: Objection. No foundation. Calls for speculation.

"THE COURT: Overruled.

"THE WITNESS: The risk of that type of an accumulation is for the artery again to become blocked off or for some of that material to break off and extend on further into the blood vessels of the brain, causing an obstruction of blood flow either of that artery, that area, or further on up in some of the smaller vessels.

"Q. (By Mr. Schwebel) And what would be the results of that?

"A. It would be, I suppose commonly referred to as a stroke and death of brain tissue.

"Q. And you mentioned an increased risk of rupture of the left carotid artery by reason of it having been injured. What would occur if there was a rupture of the left carotid artery?

"A. Well, again, if there were a rupture of the left carotid artery, the blood flowing to the brain would be diverted and by any one of a number of mechanisms would be rather instantaneous death."

On cross-examination defense counsel elicited the following evidence:

"Q. Your indication that he might or might not have problems in the future really is only in the realm of possibility?

"A. With a certain degree of medical background, that is—

"Q. You are talking about statistics and you know—

"A. I am talking about statistics, that is correct. Trauma to the carotid artery, particularly trauma to the higher portions of the carotid artery, may result in aneurysms related to weakness of that artery which may be found some five or maybe 10 years following the trauma.

"Q. But there is no way of saying to a degree of reasonable medical certainty that Mr. Dunshee is going to have that, is there?

"A. No, there is not.

"Q. And there is no way of knowing that he is going to have any problem with the build up of sclerotic material within the artery itself, is there, on an individual basis?

"A. No, there is not.

"Q. So that your testimony that he will have these problems is only in the realm of possibility?

"A. That is right."

that there was insufficient evidence of causation and present condition. Dr. Orest N. Filipovich's opinion that the obstruction was caused by the auto accident was clearly sufficient evidence of causation. As to the artery's present condition, Dr. Hauser did not testify that the artery was presently occluded; in fact, he stated that the blockage had probably cleared up. His testimony was to the effect that because the artery was once blocked, as a result of trauma, there would be scar formation. He was certainly qualified to render such an opinion.

▮ Perhaps more troublesome is defendants' contention that the statements concerning the possibility of stroke should have been excluded. To support an award for a future stroke, plaintiff must prove that the stroke is reasonably certain to occur. *Carpenter v. Nelson*, 257 Minn. 424, 101 N.W.2d 918 (1960). Defendants argue that this evidence, being in the nature of possibility of some future event, had no relevance. We were faced with a similar situation in *Mack v. McGrath*, 276 Minn. 419, 150 N.W.2d 681 (1967), where the plaintiff had lost a kidney and therefore ran an increased risk of serious complications should something happen to the remaining kidney or of trauma to the remaining kidney during pregnancy. We held that medical evidence to this effect was fair comment on the consequences of the loss of the kidney. By the same token we believe Dr. Hauser's testimony was fair comment on the implications of scar formation in the artery. In so holding, we do not retreat from the requirement that injuries be proven to a reasonable medical certainty. The injury in this case is not a stroke, but scar formation in the artery. Dr. Hauser's testimony was sufficient to prove to a reasonable medical certainty that there was scar

formation and that as a result the plaintiff runs an increased risk of stroke or aneurysm. .

▮ 3. At trial defendants attempted to introduce testimony in the nature of accident reconstruction from Richard Cox, an engineer. After defense counsel submitted a memorandum which summarized the testimony Cox would have given, the court refused to hear Cox's testimony in camera. Under Rule 43.03, Rules of Civil Procedure, the court was not required to hear the proffered testimony of Cox in camera.[2] In an action tried by a jury, the court, although required to hear the offer of proof by the defendants' attorney, was not required to take the testimony of Cox. The memorandum was a sufficient offer.

▮ 4–5. Regarding the exclusion of Cox's testimony at trial, the admissibility of expert testimony rests within the sound discretion of the trial court, and its decision will not be reversed on appeal unless there is a showing of clear abuse of discretion. *LeMieux v. Bishop*, 296 Minn. 372, 209 N.W.2d 379 (1973). In *LeMieux*, we held:

" * * * Assuming that the expert, after thorough investigation, is able to arrive at an opinion, the admissibility of that opinion will depend upon (1) whether there exist sufficient factual data to assure a reasonably complete and accurate reconstruction of the accident without indulging in speculation; and (2) more importantly, whether such opinion testimony will assist the triers of fact." 296 Minn. 378, 209 N.W.2d 383.

▮ The expert in the *LeMieux* case had given an opinion concerning the speed of one of the vehicles immediately before the collision. The expert had personally tested the road surface to determine its coefficient

**2.** Rule 43.03, Rules of Civil Procedure, provides: "In an action tried by a jury, if an objection to a question propounded to a witness is sustained by the court, the examining attorney may make a specific offer of what he expects to prove by the answer of the witness. The court may require the offer to be made out of the hearing of the jury. The court may add such other or further statement as clearly

shows the character of the evidence, the form in which it was offered, the objection made, and the ruling thereon. In actions tried without a jury the same procedure may be followed, except that the court, upon request, shall take and report the evidence in full, unless it clearly appears that the evidence is not admissible on any ground or that the witness is privileged."

of friction, examined the vehicles, and measured the skid marks. In addition there was a lack of adequate eye-witness testimony concerning speed. The expert's testimony in this case presents a stark contrast to *LeMieux.* Cox would have testified, based solely on photographs and blueprints, that the damage to plaintiff's vehicle could only have been caused by a collision with the guardrail. Acting on this assumption, he would have applied "Newton's Laws regarding the conservation of energy, the importance of elasticity and elastic limits in a collision between two bodies, and the mathematical basis or method to be used to determine the length of a side of a triangle," all of which would allegedly prove that there was no collision between plaintiff's and defendants' vehicles. Cox did not examine plaintiff's vehicle, the guardrail, or the road surface. He did not witness the accident, and conducted no tests. Moreover, the evidence included substantial eye-witness accounts of the happening of the accident, on-the-scene photographs, and the observations of a qualified investigating officer. Cox's testimony would have been little more than an interpretation of photographs in evidence and we question whether this would appreciably aid the jury. We also feel that a more thorough factual basis for Cox's opinions should have been demonstrated. Under the circumstances of this case, the trial court was well within its discretion in excluding Cox's testimony.

■ 6. Defendants lastly raise the issue of excessive damages. It is well established that a party may not challenge the excessiveness of a verdict on appeal without first moving for a new trial before the trial court on this ground. *Monson v. Arcand*, 239 Minn. 336, 58 N.W.2d 753 (1953). Defendants did not allege excessive damages in their written motion for a new trial. However, they assert that they did argue this ground orally at the hearing on the motion. Plaintiff denies that any such argument was made; there is no transcript of the hearing. Assuming defendants' contention to be true, they have failed to comply with Rule 7.02, Rules of Civil Procedure, which provides in part:

"(1) An application to the court for an order shall be by motion which, unless made during a hearing or trial, shall be made in writing, *shall state with particularity the grounds therefor, and shall set forth the relief or order sought.*" (Italics supplied.)

Accordingly, we decline to consider whether the damages in this case were excessive.

The order and judgment appealed from are in all respects affirmed.

Affirmed.