**Shirley KRUEGER, et al., Appellants,**

v.

**David A. NORDSTROM, et al.,
Respondents.**

No. C4–84–1757.

Court of Appeals of Minnesota.

May 14, 1985.

Review Denied July 26, 1985.

Paul Chamberlain, Koenig, Robin, Johnson & Wood, Mound, for appellants.

Thomas K. Berg, LaRaye M. Osborne, Popham, Haik, Schnobrich, Kaufman & Doty, Ltd., Minneapolis, for respondents.

Heard, considered and decided by RANDALL, P.J., and SEDGWICK and HUSPENI, JJ.

## OPINION

RANDALL, Judge.

Penny Goodale and her mother, Shirley Krueger, brought this action against David Nordstrom alleging that his negligence caused the car he was driving to strike Goodale and the horse she was leading. The jury which heard the case returned a verdict finding 70 percent contributory negligence, and found special damages to be $5,500 and general damages to be $5000. Plaintiffs moved for a new trial on both liability and damages. The court granted a new trial on the issue of liability but not on damages. Plaintiffs appealed the denial of their motion for a new trial on damages, and defendant filed a notice of review challenging the grant of a new trial on the issue of liability. We affirm.

## FACTS

On September 21, 1977, Penny Goodale, then 14 and known as Penny Krueger, was horseback riding with two friends. Penny's horse went lame and she dismounted and began to lead the horse. She and the horse were on the right side of a wide dirt road, half on the shoulder and half on the grass. (There were hoofprints in the dirt on the road shoulder, but not footprints.) Her friend Wendy Meir was riding on the left shoulder of the road and her other friend Susan Oberaigner was riding on the grassy area on the right side of the road just behind Penny. The accident occurred just after sunset (which occurred at 7:13 p.m.), and testimony differed as to how dark it was. A police officer who arrived at the scene at about 8:10 testified that it was just getting dark when he arrived, but Nordstrom (respondent) testified that he

had his lights on at the time of the accident and that it was "pretty dark."

Respondent stated that he did not see Penny's horse until he was 10 to 15 feet away. He was travelling at between 30 and 45 m.p.h. (his estimates varied), and left 20 foot skid marks. He struck Penny's horse, and either the horse or the car struck Penny, who was left with a badly fractured leg and a broken tooth. (The horse suffered two broken legs and had to be euthanized at the scene.)

Penny's leg was set and placed in a cast. The fracture was serious and of a type known as comminuted (the bone was broken into several pieces). After a week Penny was discharged from the hospital, but on October 5 she had to be readmitted because the bone pieces had become unaligned. The doctors drilled into her leg and inserted two Steinman pins—steel pins ⅛" thick and 9" long—through her leg above and below the break. The leg was then placed in traction until she could be released. According to Penny and her mother, the pins caused a lot of pain and trouble, tearing clothing, bedclothes and upholstery and having to be pushed back in when they would slip. On February 16, Penny was again hospitalized, to remove the pins and have a new cast put on. The last cast was removed in June. Penny has scars from the pins and a pressure callous on her heel which both sides' experts agreed needed to be removed, at a cost of about $5,200. Penny also complains of a limp and feeling self-conscious about her leg. Her expert also testified that she had developed a curvature of the spine ("scoliosis") from the slight shortening of the leg that had occurred, and that she was more likely to develop arthritis and disc problems that would require a laminectomy. Respondent's expert disputed that.

Penny also broke a front tooth in the accident. The cap that was put on the tooth has since darkened, and needs to be replaced. It will need to be replaced two or three times over her lifetime. The testimony on cost was that "costs for these future replacements will be approximately $1,300 to $1,500." It was not clear whether that was total lifetime cost or cost per replacement.

There was no specific testimony on reduction of earnings capacity. There was testimony that Penny dances and otherwise leads a normal life. No jury instruction on reduction of future earning capacity was given, although appellant requested one. The standard jury instruction on increased risk of future harm as an element of damages (JIG 151) *was* given, although without the modifications specifying increased risk of arthritis and laminectomy that appellant requested.

In instructing on the pedestrian's statutory duty to walk on the left side of the street, the trial court did not include the statutory language added in a 1973 amendment to the statute. The statute now reads: "Pedestrians when walking ... along a roadway shall, when practicable, walk or move on the left side of the roadway ..." Minn.Stat. § 169.21, subd. 5 (1982). The trial court omitted the words "when practicable." It did, however, include an instruction that that statute had to give way when there was reasonable cause for not walking on the left. The trial court agreed with appellant that that omission was a fundamental error of law, and granted a new trial on the issue of liability even though appellant had not objected during the instructions.

After the jury had begun its deliberations, it returned and asked for a "clarification of the common law in the Minnesota Statutes for the use of a motor vehicle with regard to keeping a vehicle in control, and the law regarding pedestrian obligations." The court repeated the above-mentioned instruction, including the omission of "when practicable," but did not repeat the instructions on the driver's statutory duties. The court then stated that "a violation of a statute by a driver or a pedestrian is negligence." Less than an hour later the jury returned its verdict, finding 70% contributory negligence by Penny, general damages of $5,000, and special damages of $5,500.

## ISSUES

1. Did the trial court err in refusing to order a new trial on the issue of damages?

2. Was appellant entitled to an instruction on increased risk of arthritis and surgery as an element of damages?

3. Was appellant entitled to an instruction on reduction of future earning capacity as an element of· damages?

4. Did the trial court err in ordering a new trial on the issue of liability?

## ANALYSIS

### I.

*Damages*

■ Appellant contends that after the jury determined 70% contributory negligence, it knew appellant would be precluded from any recovery and thus did not give any thought to determining damages. The jury first retired at 3:35 p.m. on June 11, 1984. The next morning at 9:30 it asked the question about statutory duties, and at 10:20 it returned its verdict. While appellant's argument is supported by the speed with which the jury returned a verdict after its question regarding liability was answered, the jury could have determined damages first, then liability.

> [T]he trial court is granted the broadest possible discretion to determine whether a new trial is necessary and, absent a clear abuse of that discretion and the existence of most unusual circumstances, its decision will not be reversed.

*Parr v. Cloutier,* 297 N.W.2d 138, 140 (Minn.1980) (citing *Fitzer v. Bloom,* 253 N.W.2d 395 (Minn.1977) and *Sandt v. Hylen,* 301 Minn. 475, 224 N.W.2d 342 (1974).

■ The trial court instructed the jury that, regardless of its finding on liability, it should fully consider its award of damages. This court cannot presume, from the length of deliberations alone, that the jury ignored that instruction. Further, it is not clear that, if appellant had prevailed on the issue of liability, the amount of damages awarded would have warranted an additur. While the verdict on damages was low

($10,500), it was not patently unreasonable, given the testimony about medical bills and the testimony that her injuries were not permanently disabling. A damage verdict may only be disturbed if it is "manifestly and palpably contrary to the evidence," and we do not find the trial court erred in refusing to order a new trial on the issue of damages. *Stuempges v. Parke, Davis & Co.,* 297 N.W.2d 252, 256 (Minn.1980).

### II.

*"Increased risk of future harm"*

■ Appellant contends that the trial court erred in "refusing to instruct the jury on increased risk of future harm as an element of damages." The trial court did, however, instruct the jury that the jury should include in its damages figure

> compensation for any pain, disability, disfigurement, embarrassment, emotional distress or mental anguish which the plaintiff is reasonably certain to experience in the future. You would also include in it compensation for the reasonable value of any necessary medical supplies and medical, hospital and surgical treatments of any and all kinds that are reasonably certain to be required in the future.

The appellant wanted the court to give an instruction patterned upon JIG II, 151 (" * * * Damages may include past and future injury. However, it must be proved that such future injury is reasonably certain to occur,") but which instructed the jury to specifically consider the increased risk of arthritis and surgery. As a practical matter, the different language requested by appellant may have made no difference. It was not reversible error for the court to give the instructions it did rather than the version requested by appellant.

■ Appellant cites *Pietrzak v. Eggen,* 295 N.W.2d 504 (Minn.1980), in favor of her requested instruction. That case *does* say that an instruction on future harm as an element of damages should be given if testimony has established that future harm is "more likely than not" to occur, but it

does not say what *kind* of an instruction. Thus, the standard JIG II, 151 instruction given in this case satisfies *Pietrzak*. Appellant also cites *Dunshee v. Douglas*, 255 N.W.2d 42 (Minn.1977), as support for her position. The issue in that case, however, was not whether an instruction on future harm should be given; it was whether testimony (by a doctor) as to the measurable risk of future harm was admissible. That case does not control. The trial court's instruction here was not clear error.

## III.

### Reduction in earning capacity

■ Appellant also contends the trial court erred in refusing to give an instruction on the reduction of Penny's future earning capacity as an element of damages. In declining to give JIG II, 160, or a similar instruction, the court stated that there had been a "complete absence of evidence relating to any effect of any injuries on future earning capacity." The court was correct. Except for the limited testimony of appellant's doctor that future surgery on her heel callous and knee scars would require that she take about six weeks off work to recuperate, there was no other testimony relative to future earning incapacity.

■ It is true that "[I]mpairment of earning capacity is an item of general damages" which does not require specific proof of actual earnings or income either before or after the injury. *Wilson v. Sorge*, 256 Minn. 125, 97 N.W.2d 477, 483 (1959). Before such an instruction is required, however, the plaintiff must first establish by a fair preponderance of the evidence the extent to which such impairment of ability to earn money is likely to occur. *Parr v. Cloutier*, 297 N.W.2d at 140. And while medical evidence is helpful,

> the existence of future damages or permanent injuries may sometimes be inferred from other evidence, as where, for example, it is shown that the plaintiff is not fully recovered at the time of trial.

*Carpenter v. Nelson*, 257 Minn. 424, 101 N.W.2d 918, 922 (1960).

While it might have been better for an instruction on reduction of earning capacity to have been given, the reduction of earning capacity, if any, of appellant, was modest and not a proven expectation. If it was error not to give an instruction on future earning capacity, the error was not reversible.

## IV.

### Liability

■ Finally, respondent contends that the trial court erred in ordering a new trial on the issue of liability. The basis for the court's order was that it did not include the words "where practicable" in its instruction on a pedestrian's statutory duty to walk on the left side of the street. As we quoted in the first section of this opinion, the trial court has discretion to determine whether a new trial is necessary. "[A]bsent a clear abuse of that discretion and the existence of most unusual circumstances, its decision will not be reversed." *Parr v. Cloutier*, 297 N.W.2d at 140. The trial court was in the best position to determine the effect of the instructions and the error in the instructions on the jury. Given the fact that the legislature thought the addition of "where practicable" to Minn.Stat. § 169.21, subd. 5, was important enough to merit amending the statute, the court's determination that the omission of the phrase in the jury instructions warranted a new trial on liability was not an abuse of discretion.

## DECISION

The trial court did not err in refusing to order a new trial on the issue of damages while ordering a new trial on the issue of liability.

Affirmed.