Jeffrey L. **FOUST**, et al., Respondents,

v.

John R. **McFARLAND**,
et al., Appellants.

Nos. A04–760, A04–1956.

Court of Appeals of Minnesota.

June 14, 2005.

Review Filed Aug. 16, 2005.

---

Ronald I. Meshbesher, John P. Sheehy, Michael C. Snyder, Pamela J. Spaulding, Meshbesher & Spence, Ltd., Minneapolis, MN, for respondents.

Paul V. Esposito (pro hac vice), Clausen Miller P.C., Chicago, IL; and Diane B. Bratvold, Rider Bennett, LLP; and Brian N. Johnson, Sheila T. Kerwin, Amanda M. Cialkowski, Halleland Lewis Nilan Sipkins & Johnson, P.A., Minneapolis, MN, for appellants.

Considered and decided by RANDALL, Presiding Judge; MINGE, Judge; and PORITSKY, Judge.*

## OPINION

RANDALL, Judge.

Appellants appeal from the denial of their motion for judgment notwithstanding the verdict (JNOV), new trial, or remittitur, alleging that (1) the evidence does not support the jury's determination and is contrary to law, (2) certain evidence should not have been excluded, (3) respondents' intentional destruction of evidence should result in dismissal of their claims. Appellants also appeal from the partial denial of their motion for collateral source setoff. Respondents argue that the district court properly applied the law determining the setoff. We affirm on all issues.

## FACTS

### The parties

This appeal arises from a $11,310,464 jury verdict. Appellants are driver John

---

* Retired judge of the district court serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

R. McFarland, his employer USF Holland, Inc., and its parent company U.S. Freightways, Inc. Respondents are Jeffrey and Linda Foust, (hereinafter Foust and L. Foust) who reside with their three children in Minnetonka.

## The collision

On May 15, 1998, Foust suffered brain and other injuries as a result of a collision with appellants' truck driven by McFarland. The collision occurred at the intersection of U.S. Highway 12 and County Road 6 in Orono, Minnesota. Traffic lights controlled the intersection, but a severe storm that afternoon had disabled them. A number of vehicle drivers were treating the intersection as a four-way stop because of the disabled traffic lights. Foust was among these drivers, and after waiting his turn, proceeded into the intersection. McFarland, who was driving a semi-truck at a speed of 55 mph, struck the vehicle driven by J. Foust in the intersection.

## The injuries

Both sides presented extensive expert testimony regarding the extent of Foust's brain injuries. According to respondents' experts, Foust suffered injuries, including a diagnosis of traumatic brain injury (TBI). Respondents' experts testified that Foust continues to suffer from frontal lobe injury, exhibited by clear deficits in attention, concentration, processing speed, learning memory and executive functioning. This injury resulted in significant impairment to Foust's personal and social competencies.

Dr. Morgan, a neurology expert and witness for the respondents, testified that though Foust suffers from frontal lobe injury, he had a strong performance on "fund of information and vocabulary," explaining:

we know that brain injuries more likely affect some things more than others. And that's why we give a broad range of tests, not just those that are potentially sensitive to traumatic brain injury. And we look for separation. What you referred to were tests of fund of knowledge, fund of information, and vocabulary. And on those sorts of tests, he's at the 91st percentile compared to others of comparable age. These are tests that we know aren't likely to be affected by head trauma. They are very overlearned skills. Unless you've got some pretty massive structural abnormalities or have been in a coma for months and are tested closer to the time of the injury, those aren't likely to be much affected. So those tend to give you a sense of where this person is likely to have functioned before an injury because those stay up. They aren't affected. So what these would suggest is that this is somebody who before the injury was likely to have been well above average, possibly even within what we call the superior range.

. . . .

The brain is specialized and there are certain aspects of function that are more likely to be affected by others. And this more conversational, language skills, body of knowledge, the kinds of things that are going to impress on conversational contact, are intact.

. . . .

The effects of traumatic brain injury are commonly most likely to show up on tests of learning and memory. He's got a number of memory test performances that are actually below average and not even within the average range, which would be suspiciously low for him. But these are below the average range compared with others of comparable age. Similarly, on tests of more complex reasoning of different sorts, performance from the lower portion of average to

below average levels would be suggestive in his case of some decline from where he was before.

Appellants presented the expert testimony of Dr. Lamberty, a neuropsychologist. Dr. Lamberty recognized that Dr. Morgan is regarded highly in the field. Lamberty agreed that Foust suffered brain injury as a result of the collision. However, Lamberty disagreed with the extent of Foust's brain injury.

### The pre-accident career

The parties agree that prior to the accident Foust was a successful businessman. Foust was a telecommunication engineer and entrepreneur. During college, Foust worked as a coal miner and eventually earned a degree in electrical engineering. Early in his career, Foust worked for technology companies, eventually starting his own company, Telinq, which developed sophisticated, high-speed multiplexer telecommunications equipment. His company sold millions of dollars of equipment. He developed products for major corporations, including Minneapolis-based ADC Telecommunications. ADC later purchased the company from Foust and hired him. According to appellants, Foust helped transform ADC into an industry giant in digital electronic telecommunications transmission.

### Post-accident

The parties disagree on Foust's ability to work after the collision. Both sides presented testimony to the jury regarding J. Foust's post accident employment. According to a number of witnesses presented by respondents, including a number of employees of ADC, Foust had difficulties with memory, planning, and controlling his temper after returning to work. Foust missed meetings, was confused, and could no longer make critical decisions. His work performance was unacceptable. Mary Pat Pearson, Director of Human Resources, testified that Foust did not improve and ADC "couldn't tolerate anymore." Foust testified that he was depressed and had suicidal ideations at times. He was treated medically for this. Appellants presented expert testimony through Dr. Lamberty that Foust could be employed—though at a reduced level from pre-accident conditions.

### The computer

On July 16, 2003, following the deposition of L. Foust, appellants asked respondents to produce their computers. On July 28, 2003, respondents filed an objection to this discovery request. On August 13, 2003, the district court heard the dispute. The court ordered production of respondents' computers.

After trial began, appellants' forensic computer expert, Mark Lanterman reported to appellants that during an examination of respondents' computer, he determined that some data had been permanently deleted. Appellants moved to dismiss respondents' negligence claims, based on this spoliation of evidence. Alternatively, appellants requested a mistrial, continuance, or adverse inference instruction.

A few days later, Lanterman, testifying outside of the presence of the jury stated that he had found child pornography[1] on the computer. In addition to the child pornography, Lanterman found a number of other documents including correspondence between Foust and other people. He found some illegal downloads of intellectual property. Appellants sought to introduce the evidence found on the computer. Some of the evidence was allowed, but much of it was denied. Appellants assert the denial was erroneous.

[1]. The exact amount of child pornography is disputed.

Then on September 3, 2003, appellants claimed that Lanterman had found that portions of unallocated space on the laptop computer had been "scrubbed" using a "WipeInfo" program. The WipeInfo program is a computer program that permanently deletes data from the hard drive of a computer.

On the same day, the district court made a determination that respondents were responsible for spoliation of computer data. As a result, the court granted appellants' request for sanctions and concluded that an adverse inference instruction would be read to the jury. The district court then determined that any evidence of the child pornography, and other bad acts, was "unnecessarily confusing, misleading, cumulative, and more prejudicial than probative" and ruled it inadmissible. The court further determined that neither Lanterman nor Foust could be questioned regarding circumstances surrounding the spoliation.

On September 12, 2003, the jury returned a verdict for respondents in the amount of $11,310,464.64. It apportioned fault of 80% to appellants and 20% to respondents. The court entered judgment for respondents in the amount of $9,048,371.71 exclusive of statutory costs, disbursements, and interests.

Following judgment, appellants moved for multiple collateral source setoffs. The parties first stipulated to an award of $135,464.64 in past medical expenses. The parties then agreed to a $20,000 setoff and another setoff for Blue Cross' $42,983.37 payment. Then appellants requested an additional setoff of $72,481.27 for amounts billed by medical providers for Foust's care, but which was discounted pursuant to the agreement between the medical providers and the medical insurance company. The district court denied appellants' request for a setoff for those medical bills charged but not paid for by Foust and not paid by the medical insurance company.

This appeal followed.

## ISSUES

1. Did the district court err by applying *Patton v. Newmar Corp.* and its progeny in this intentional spoliation of evidence case?

2. Did the district court err by barring introduction of evidence during cross-examination and closing argument about the circumstances of the spoliation?

3. Did the district court err in denying appellants' requested setoff amount?

## ANALYSIS

**1. Did the district court err in its application of *Patton v. Newmar Corp.* in this spoliation of evidence case?**

The district court has broad authority in determining what, if any, sanction is to be imposed for spoliation of evidence. *Patton v. Newmar Corp.*, 538 N.W.2d 116, 118–19 (Minn.1995). On review, an appellate court considers whether the district court is authorized to impose a sanction for spoliation of evidence and, if so, whether it abused its discretion by imposing such a sanction, *Wajda v. Kingsbury*, 652 N.W.2d 856, 860 (Minn.App. 2002), *review denied* (Minn. Nov. 19, 2002), and will not reverse unless it is clear that no reasonable person would agree with the district court's decision. *Patton*, 538 N.W.2d at 119.

Appellants assert that the *Patton* abuse-of-discretion standard of review is inappropriate in spoliation cases where a party *intentionally* and in bad faith destroys evidence. Appellants argue that a de novo standard of review should be applied. We disagree. There is no authority

limiting *Patton* to cases involving only negligent or unintentional destruction of evidence. Rather, *"Patton* applies to any case where critical evidence has been destroyed." *See Wajda,* 652 N.W.2d at 864. Regardless of intent, disposal of evidence is spoliation when a party knows or should know that the evidence should be preserved for pending or future litigation. *Patton,* 538 N.W.2d at 119.

## A. Patton and its Progeny

■ Appellants first argue that *Patton* does not meet the needs of justice in intentional spoliation cases. We are not sure why *Patton* does not. "Spoliation" of evidence simply refers to the destruction of relevant evidence by a party. *Hoffman v. Ford Motor Co.,* 587 N.W.2d 66, 71 (Minn. App.1998). While courts have long afforded redress for the destruction of evidence, *Federated Mut. Ins. Co. v. Litchfield Precision Components, Inc.,* 456 N.W.2d 434, 436 (Minn.1990), Minnesota does not recognize an *independent* spoliation tort. *Id.* at 437.

■ Spoliation sanctions are typically imposed where one party gains an evidentiary advantage over the opposing party by failing to preserve evidence. *See Himes v. Woodings–Verona Tool Works, Inc.,* 565 N.W.2d 469, 471 (Minn.App.1997), *review denied* (Minn. Aug. 26, 1997). This is true where the spoliator knew or should have known that the evidence should be preserved for pending or future litigation; the intent of the spoliator is irrelevant. *Patton,* 538 N.W.2d at 119. When the evidence is under the exclusive control of the party who fails to produce it, Minnesota also permits the jury to infer that "the evidence, if produced, would have been unfavorable to that party." *Federated Mut.,* 456 N.W.2d at 437; *see also Wajda,* 652 N.W.2d at 861.

■ Further, "[t]he propriety of a sanction for the spoliation of evidence is determined by the prejudice resulting to the opposing party." *Hoffman,* 587 N.W.2d at 71. Prejudice is determined by considering the nature of the item lost in the context of the claims asserted and the potential for correcting the prejudice. *Patton,* 538 N.W.2d at 119.

■ Appellants argue that *Patton* is inapplicable here because (1) it has only been applied in civil cases involving unintentional or negligent spoliation, and (2) the prejudice requirement requires actual knowledge of the nature of the item lost, and the district court here did not "know exactly what was lost." Appellants thus argue that this case is different from a *Patton* case because of respondents' bad faith and intentional spoliation of evidence. Appellants argue that since the contents of the evidence from the computer were destroyed, the district court could not accurately determine prejudice—"because it had no basis for determining the prejudice." As a result, appellants contend the court should be guided by the purpose of punitive damages, which is to "punish the perpetrator, to deter repeat behavior and to deter others from engaging in similar behavior." Appellants argue that the district court sanctions here were too weak to constitute punitive sanctions. Appellants wanted, if it could, an outright dismissal with prejudice of the plaintiffs' case. In the alternative, appellants wanted a mistrial/continuance and other sanctions.

Respondents, on the other hand, argue that the district court properly weighed the various factors and came up with appropriate sanctions. Respondents claim the district court did not abuse its discretion by allowing the trial to continue. The circumstances surrounding the accident were supported by the testimony of a number of eyewitnesses. The large amount of

expert testimony, along with other evidence substantially supported Foust's injuries. Appellants had a significant amount of adverse medical testimony. The district court concluded that the missing evidence did not substantially and materially affect the overall claim. We agree. Both the record and the law support the district court's determination. First, *Patton* is the law in Minnesota on spoliation. *See Wajda,* 652 N.W.2d at 864 ("*Patton* applies to any case where critical evidence has been destroyed."). Second, Minnesota law does not differentiate between intentional and unintentional spoliation. *See Patton,* 538 N.W.2d at 118 (regardless of intent, disposal of evidence is spoliation when a party knows or should know that the evidence should be preserved for pending or future litigation). Third, as in other spoliation cases, the court here had to calculate its determination of prejudice based partly on *unavailable* evidence. Spoliation cases, *by their nature,* require at least a partial inference of prejudice based on unobtainable (spoiled) evidence. This case is not "special" as appellants' claim.

We find nothing unique about a spoliation case where the spoliation is intentional. The district court, within its discretion, weighed the entire record in front of it, the nature of the item lost, the context of the claims asserted, and the potential for correcting the prejudice. The court gave appellants' argument credence when it determined that the destruction of the computer evidence *was prejudicial* to appellants. The district court, using its discretion, sanctioned respondents, and properly applied current Minnesota law (*Patton*) on spoliation.

## B. Adverse inference instruction

■ Appellants challenge the district court's sanction for spoliation of evidence, arguing that the adverse instruction sanction given "is not harsh enough." Courts can sanction a party for spoliation of evidence when one party gains an evidentiary advantage due to its failure to preserve evidence after that party has been given the opportunity to examine it. *Himes,* 565 N.W.2d at 471. The *Patton* court addressed the authority of the district court in these matters when it stated:

While we have never specifically addressed the scope of the trial court's authority to impose a sanction for spoliation of evidence, we often have commented that courts are vested with considerable inherent judicial authority necessary to their "vital function—the disposition of individual cases to deliver remedies for wrongs and 'justice freely and without purchase; completely and without denial; promptly and without delay, conformable to the laws.'" The task of determining what, if any, sanction is to be imposed is implicated by the broad authority provided the trial court.

*Patton,* 538 N.W.2d at 118–119 (citations and quotations omitted). The party challenging the trial court's choice of a sanction has the difficult burden of convincing an appellate court that the trial court abused its discretion—"a burden which is met only when it is clear that no reasonable person would agree [with] the trial court's assessment of what sanctions are appropriate." *Id.* at 119.

■ Appellants argue that the district court abused its discretion by refusing to allow a mistrial or continuance, instead of the less harsh sanction of an adverse instruction. They argue that they were greatly prejudiced—given the relevance of some of the recovered documents. Specifically, they argue that they needed time to properly develop the already-recovered evidence, focusing on the correlation between

pornography and heightened depression and anxiety.[2]

Respondents, on the other hand, argue that the district court's determination to use the sanction of an adverse inference instruction was sound. They argue that the court corrected based its decision on the nature of the documents admitted, the weight of the medical testimony, and the evidence showing J. Foust's abilities.

■ The trial court has discretion whether to grant a continuance, and its ruling will not be reversed absent a showing of clear abuse of discretion. *Dunshee v. Douglas,* 255 N.W.2d 42, 45 (Minn.1977). "The test is whether a denial prejudices the outcome of the trial." *Weise v. Comm'r of Pub. Safety,* 370 N.W.2d 676, 678 (Minn.App.1985). A trial court will not be reversed unless its failure to declare a mistrial or to grant a new trial constituted a clear abuse of discretion. *See, e.g., Reese v. Ross & Ross Auctioneers, Inc.,* 276 Minn. 67, 71, 149 N.W.2d 16, 19 (1967); *Colgan v. Raymond,* 275 Minn. 219, 226, 146 N.W.2d 530, 535 (1966); *Harris v. Breezy Point Lodge, Inc.,* 238 Minn. 322, 329–30, 56 N.W.2d 655, 660 (1953).

The district court ultimately determined that the sanction of an unfavorable inference instruction was appropriate. Specifically, on September 3, 2003, the court stated:

> I believe a sanction is appropriate but not a draconian sanction, so what I'm

going to do is have the [appellants] prepare … an instruction that I'm going to read to the jury during the final instructions consistent with Civ JIG 12.35, which reads that, "If either party does not produce evidence that the party could reasonably be expected to produce" and intentionally destroys evidence which that party has been ordered to produce "and fails to give a reasonable explanation, you may decide that the … evidence would have been unfavorable to that party" And I'll consider proposed instructions from either side, but I am going to give an unfavorable inference instruction.[3]

The next day, appellants again brought up the spoliation issue and asked that the court not wait until the end of trial to read the unfavorable inference instruction. They asked that the court read the instruction before the start of that day's cross-examination. In response the court stated:

> I think I've imposed the least severe sanction that I could have imposed. I could have imposed a much more severe sanction but, given the nature of the allegations here of the frontal lobe injury and how it may or may not affect Mr. Foust's cognitive functioning, I really do continue to feel that the relevancy of—of whatever might have been found was small in comparison to the potential to confuse the jury and to be more prejudicial than probative. So I'm—I'm com-

---

**2.** To further bolster its argument, appellant wishes to supplement the appellate record with outside material not presented to the district court, arguing that they were simply aiding this court by calling attention to research material available in the public domain. However, this court may not consider matters outside the record on appeal and must strike references to such matters from the parties' briefs. *Fabio v. Bellomo,* 489 N.W.2d 241, 246 (Minn.App.1992), *aff'd,* 504 N.W.2d 758 (Minn.1993). The reference material consists of support for appellant's argument, it is the type of evidence that is required to be put in the record and submitted to the district court. Thus, although these articles are available to the public, they cannot be considered as part of the record on appeal.

**3.** The court then went on to cite relevant authority for the unfavorable inference instruction.

fortable with the fact that in all likelihood if there had been anything found on these hard drives; it probably wouldn't have come in anyhow. But the conduct of Mr. and Mrs. Foust in intentionally violating my order requires a serious sanction and I'm going to give this instruction. I think it's fair. I think it punishes somebody for intentional misconduct, which is what I've determined here, and I think it comes within the Court's discretion under *Patton v. Newmar* where the court says at page 119 that, "One challenging the trial court's choice of a sanction has the difficult burden of convincing an appellate court that the trial court abused its discretion—'a burden which is met only when it is clear that no reasonable person would agree [with] the trial court's assessment of what sanctions are appropriate,' " citing *Marrocco v. General Motors*, [966 F.2d 220 (]7th Cir.1992). And I think a—I think this is a reasonable sanction.

Based upon the record, the district court made a determination of an appropriate sanction. The court recognized the seriousness of respondents' conduct, weighed the record and made a determination that an unfavorable inference instruction was appropriate. The use of an unfavorable inference instruction is a sanction permitted by Minnesota courts in spoliation of evidence claims. *See Federated Mut.*, 456 N.W.2d at 436–37. Further, the court favorably ruled for appellants' by allowing the instruction to be read to the jury before deliberations. We see no reason for a new rule of law calling for a presumption that a dismissal with prejudice of the spoiling party's claims is the best and fairest sanction when the spoliation is intentional. "Intentional" is certainly a factor, but it is not conclusive.

**2. Did the district court err by barring introduction of evidence during cross examination and closing argument about the circumstances of the spoliation?**

 Appellants next argue that the district court committed reversible error by excluding all evidence surrounding the circumstances of the spoliation. Absent erroneous interpretation of the law, the question of whether to admit or exclude evidence is within the district court's discretion. *Kroning v. State Farm Auto. Ins. Co.*, 567 N.W.2d 42, 45–46 (Minn.1997). Evidentiary error is prejudicial if it might reasonably be said to have changed the result of the trial. *Poppenhagen v. Sornsin Constr. Co.*, 300 Minn. 73, 79–80, 220 N.W.2d 281, 286 (1974); *see State v. Bolte*, 530 N.W.2d 191, 198 (Minn.1995) (providing that an error in admitting evidence is prejudicial "if there is a reasonable possibility that the verdict might have been more favorable to the defendant if the evidence had not been admitted") (quotation omitted).

Under Minn. R. Evid. 401, " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The comments to Minn. R. Evid. 401 provide, "[i]f the offer has any tendency to make the existence of a fact of consequence more or less probable than it would be without the evidence it is relevant. A slight probative value is sufficient under rule 401." Relevant evidence that is not prohibited by the state or federal constitutions, by statutory requirements, or by the rules of evidence is admissible. Minn. R. Evid. 402.

Under Minn. R. Evid. 403, relevant evidence may be excluded "if its probative value is substantially outweighed by the

danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Rule 403 "favors the admission of relevant evidence by requiring a determination that its probative value be 'substantially' outweighed by the dangers listed in the rule...." Minn. R. Evid. 403 comm. cmt. The district court is afforded broad discretion to determine if relevant evidence must be excluded under rule 403, and this court will not reverse that decision unless the district court "clearly abused" its discretion. *Wagner v. Thomas J. Obert Enter.*, 396 N.W.2d 223, 229 (Minn.1986).

Appellants argue that the circumstances surrounding the spoliation of evidence are important because they offer clues about the importance of the destroyed evidence. Appellants argue that they should have been able to question their computer expert, Lanterman, about the evidence, or, respondent Foust should have been required to explain it. Specifically, appellants argue that the evidence of the child pornography bore on the weight to be given to Foust's injuries and L. Foust's consortium claim.

Respondents argue that the evidence was properly excluded based on relevancy. They contend that appellants only wanted to admit the pornography evidence to show that Foust was a bad character and had committed bad acts.

The district court stated:

[O]nce the court ordered production of the computers, it's my finding—and the evidence is overwhelming—that either Mr. or Mrs. Foust used the Wipe Info program to wipe out information prior to the time that the computers were delivered to the Road Runner Transportation Company as evidenced by Exhibit 13. I have serious doubts as to the relevancy, and its my considered judgment, based on everything that I've heard, that even if the information that was wiped out had not been wiped out, that its probative value would have outweighed its prejudicial effect.

. . . .

In this case, based on everything I've heard, there should be redress and the redress will be in the form of an unfavorable inference. We're not going to go into it in cross. I think the defense has all the ammunition it needs, and, as I've indicated under Rule 403, everything I've heard here would indicate that no matter what was found, it would be likely found by myself that it's unnecessarily confusing, misleading, cumulative, and more prejudicial than probative.

The district court sat through hours of expert testimony in this case. We find no error by the district court in determining that the introduction of certain evidence concerning the spoliation was more prejudicial than probative.

We understand appellants' claim that they wanted extensive cross-examination and their own expert to testify that if a computer user is so sophisticated as to be able to use deletion software correctly, it shows a high degree of intelligence and cognitive ability and would have a bearing on the extent of the brain injury. However, as respondents point out, the district court acknowledged that argument, and pointed to the extensive testimony, lay and expert, on both sides as to the degree of plaintiff's brain injury. The district court reasoned that some of the information was character assassination and was more prejudicial than probative. We have no reason on appellate review to disturb the district court's conclusions.

The district court could have given other sanctions, but it did not. We review what

the district court did. The sanctions it chose were easily within the bounds of its discretion.

### 3. Did the district court err in denying appellants' requested setoff amount?

■ Finally, appellants argue that the district court erred in failing to reduce the amount of the award by $72,481.27—the amount billed by medical providers for J. Foust's care, but which was discounted. Minnesota's collateral source statute provides in pertinent part:

Subd. 2. Motion. In a civil action, whether based on contract or tort, when liability is admitted or is determined by the trier of fact, and when damages include an award to compensate the plaintiff for losses available to the date of the verdict by collateral sources, a party may file a motion within ten days of the date of entry of the verdict requesting determination of collateral sources. If the motion is filed, the parties shall submit written evidence of, and the court shall determine:

(1) amounts of collateral sources that have been paid for the benefit of the plaintiff or are otherwise available to the plaintiff as a result of losses except those for which a subrogation right has been asserted; and

(2) amounts that have been paid, contributed, or forfeited by, or on behalf of, the plaintiff or members of the plaintiff's immediate family for the two-year period immediately before the accrual of the action to secure the right to a collateral source benefit that the plaintiff is receiving as a result of losses.

Subd. 3. Duties of the court. (a) The court shall reduce the award by the amounts determined under subdivision 2, clause (1), and offset any reduction in the award by the amounts determined under subdivision 2, clause (2).

Minn.Stat. § 548.3, subds. 2, and 3 (2002).

■ A primary purpose of the collateral source statute is to avoid double recovery by a plaintiff. *Imlay v. City of Lake Crystal,* 453 N.W.2d 326, 331 (Minn.1990). While a primary purpose of the collateral source statute is to prevent double recoveries by a plaintiff, the statute does not prohibit double recoveries in all instances. *Smith v. Am. States Ins. Co.,* 586 N.W.2d 784, 786 (Minn.App.1998), *review denied* (Minn. Feb. 18, 1999).

Appellants contend that they are entitled to a collateral source deduction to prevent respondents from recovering, as a result of the insurance deduction, the costs of surgery from both Blue Cross and Blue Shield and from appellants. Respondents, on the other hand, argue that what the district court did is supported by statute and caselaw.

The parties disagree over the application of *Stout v. AMCO Ins. Co.,* 645 N.W.2d 108 (Minn.2002) to this case. The district court relied on *Stout* in making its determination. In *Stout,* the supreme court considered a nearly identical argument, holding that a no-fault insurer may not "attempt[ ] to reduce its obligation to provide basic economic loss benefits on the ground that another source of benefits has stepped in and decreased the amount of the injured person's medical bills—whether by paying them, obtaining discounts, or some other means." 645 N.W.2d at 114. The court, also, stated that,

[a] reduction in the amount billed, whether obtained pursuant to a settlement agreement or a health insurer's fee schedule, does not modify the amount of medical expense incurred. We therefore conclude that the medical expense incurred by [the claimant] is the full amount reflected on his medical bills,

and not the amount that was paid in satisfaction of those bills as the result of collateral transactions involving [the claimant's] health insurer.

*Id.* at 113 (citations omitted); *see also Collins v. Farmers Ins. Exchange,* 271 Minn. 239, 244, 135 N.W.2d 503, 507 (1965) (holding that a no-fault insurer must reimburse an insured the amount of medical expenses incurred and "not the amount he paid as a result of a collateral transaction"). We understand, as appellants note, that the applicable statute in *Stout* was the Minnesota No Fault Automobile Insurance Act (Minn.Stat. §§ 65B.41–65B.71) (2002), not the collateral source statute. Under the No Fault Act, a plaintiff may recover "for all loss suffered through injury arising out of the maintenance or use of a motor vehicle...." Minn.Stat. § 65B.44, subd. 1(a) (2002). However, we find the purpose behind both statutes to have similarities.

The jury was given the gross amounts of the victim's medical bills and returned a verdict of $11,310,464.04. Following the final judgment, appellants moved for collateral source setoffs. The parties agreed to a calculation of $135,464.64 for past medical expenses. The parties agreed to a $20,000 setoff and then another setoff of Blue Cross' $42,983.37 payment. Appellants are entitled to those in-chambers collateral source setoffs. However, we conclude that appellants are not entitled to their requested third setoff of $72,481.27. That amount was never paid, but rather represents an amount which the medical insurance providers billed Foust but did not attempt to collect pursuant to Foust's employer's medical plan.

The jury was given the gross amount of the respondents' medical bills, as both sides agreed that was proper. The issue is, does the insurance company get a collateral source reduction in the verdict for money they did not pay, but the victim did

not have to pay either. The district court ruled that the benefit had to fall someplace and he placed it with the injured victim, who had indirectly paid for the reduction in what the insurance company had to pay by paying premiums to his insurance company who, in turn, negotiated favorable terms for their subscribers. We conclude the district court was correct in its determination that appellants are not entitled to a collateral source deduction for medical charges billed by medical providers but not paid for by the insurance companies and not paid for by the victim.

## DECISION

The district court properly applied Minnesota law in determining sanctions for spoliation of evidence and properly used its discretion under Minn. R. Evid. 403, in determining that certain evidence should be excluded at trial.

The district court properly determined the extent of the collateral source setoff that appellants were entitled to.

The record contains competent evidence to sustain the verdict on negligence and the damages assessed by the jury.

The district court did not err by not granting a JNOV, or a new trial, or a remittitur.

**Affirmed.**

MINGE, Judge (concurring in part, dissenting in part).

I concur in the opinion and decision but respectfully dissent with respect to that portion dealing with collateral source setoff. The record reflects that respondent's medical bills were discounted as a result of contractual agreements between his healthcare providers and his healthcare insurer. Respondent was entitled to this discount as a function of his enrollment in a healthcare plan and the payment of pre-

miums. Such discounts are commonplace and often dramatic.

Reliance on *Stout v. AMCO Ins. Co.,* 645 N.W.2d 108 (Minn.2002), is misplaced. That decision was based on claims under the No–Fault Act. Minn.Stat. §§ 65B.41–65B.71 (2004). The court was concerned that the no-fault insurer was dilatory in paying claims. 645 N.W.2d 108 at 111, 114. Our case arises under the collateral source statute. Minn.Stat. § 548.3 (2004). This court should not add to the surreal world of healthcare billing by giving the discounted portion of a bill asset status. I would limit recovery to what is payable. We cannot afford the luxury of windfalls.